### SCHOONMAKER v. ERIE R. CO.

(Supreme Court, Appellate Division, Second Department. December 30, 1908.)

MASTER AND SERVANT (§ 278*)—PERSONAL INJURIES—RAILROADS—CAUSE OF ACCIDENT—SUFFICIENCY OF EVIDENCE.

In an action for injuries to a railroad employé based on the master's negligence in employing an engineer having epileptic fits, and on the theory that the accident occurred by reason of one of these fits, evidence considered, and held to show that the accident was not caused by negligence of defendant.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

Gaynor and Hooker, JJ., dissenting.

Appeal from Trial Term, Orange County.
Action by Elijah Schoonmaker against the Erie Railroad Company for personal injuries. From an order dismissing the complaint and from a judgment for defendant, plaintiff appeals. Judgment and order affirmed.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR, and RICH, JJ.

Thomas Watts (Abram F. Servin, on the brief), for appellant.
Henry Bacon, for respondent.

WOODWARD, J. The complaint in this action, which is to recover damages for personal injuries alleged to have been sustained through the negligence of the defendant, alleges that the defendant is a domestic railroad corporation, and that the plaintiff was employed as an engi-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

neer of such corporation upon an engine in the corporation's yard at Port Jervis, and that while so employed he sustained the injuries complained of, without fault on his part, by reason of the fact that one Roberts, an engineer upon another engine, ran his train into the yard at a high rate of speed, colliding with the engine on which the plaintiff was stationed. The negligence alleged against the defendant is that Roberts, to the knowledge of the defendant, was an incompetent man to be intrusted with the position of engineer, by reason of disease, which was likely to attack him at any time, and which rendered him temporarily unconscious, dazed, and stupid, and that the accident occurred because the said Roberts was at the time of this accident "so suffering, overcome, and incapable."

Upon the trial of the action the plaintiff produced evidence to show: That on the 8th day of October, 1904, Roberts was on the engine making a regular run from Newburgh to Port Jervis. That at Guymard, a station about eight miles from Port Jervis, the whistle was sounded four times for the crossing, and the air brakes were applied for the purpose of testing them; the roadway being at a steep grade all the way to Port Jervis. That at the next crossing the engineer gave no signal, and rang no bell (though as to the latter it is probably a duty belonging to the fireman), and this was true at the Black Rock crossing. That at Wood Pit, the beginning of the yard limit, where the rule requires trains to slow down to six miles an hour, there was no checking of the speed, and no signals were given. That, entering the yard, the train increased in speed to 50 or 60 miles an hour, running past a danger signal and colliding with plaintiff's engine, which stood upon the track with a headlight burning, facing the approaching train, in plain view for nearly half a mile. That Roberts made no move to stop the train, though sitting in his proper place with his hand upon the air brake lever, until the fireman, discovering the danger, spoke to him, when he applied the air, but too late to avoid the collision. After the collision, Roberts remained seated in the cab for a few moments, made an effort to start the injector, but was told that the pipe had been broken. He then made a misstatement, it is claimed, as to his fireman's name, and got down onto the ground, walked around in front of his engine, and then went across lots home.

The plaintiff then adduced evidence tending to show that Roberts, during a period of 14 years, during the most of which time he had been in the employ of the defendant, had on seven or eight different occasions had fainting spells or fits, in which he was temporarily unconscious, and the theory of the plaintiff is that he had one of these fits on the evening of October 8th, resulting in the accident, and that the defendant is liable for the injuries because of his employment. The learned court charged the jury that there was no evidence to show any direct notice of the alleged epileptic fits to any one authorized to employ or discharge Roberts, but that if the fact that he had such fits was so much a matter of common knowledge that the defendant, in the exercise of reasonable care in supervising its employés, would or should have known of it, that the defendant might be held liable for the negligence. At the same time, the court charged that if the accident was not due to the fact that Roberts was, at the time of the

accident, suffering one of these attacks, the plaintiff could not recover, and this charge, as finally given, does not appear to be questioned. By agreement of the parties the motions to dismiss were reserved, and the jury found in favor of the plaintiff in the sum of $15,000, whereupon the learned court set the verdict aside and granted the motion to dismiss, holding, in an opinion, that there was no evidence to show that Roberts was, at the time of the accident, or during that day, afflicted with one of these fits, but that the contrary appears. The plaintiff appeals from the order.

From an examination of the evidence in this case we are unable to discover how the court could have reached any other conclusion. It is true that there were some admissions and some suggestions in the evidence that a man with epileptic fits might have permitted his train to run down this grade without giving signals, etc., but this would be just as true if Roberts had fallen asleep, and he said, in a statement at the time of the accident, that he did take a nap on this evening, and in his testimony, taken by commission, he says he did not have a fit on this occasion. His fireman, who sat opposite him in the cab, four or five feet away during the entire run, and who looked at him from time to time, testifies that he saw none of the symptoms which are described as belonging to epileptic fits, or to the class of fits which the witnesses describe, such as spasmodic movements of the hands and arms, falling forward, frothing at the mouth, etc., but that, on the contrary, he sat upon the seat with his hand upon the air lever, looking to the front, in just the position that he would occupy in the proper discharge of his duties. The train is described as running into the yard at Port Jervis at 50 to 60 miles an hour, and, if Roberts had had an epileptic fit, rendering him unconscious, it is contrary to all reason that he could have maintained his position, especially when the shock of the collision occurred, or that his fireman would not have noticed some irregularity in his actions. It is possible, of course, that he may have had such a fit, but it is highly improbable, and there is certainly no evidence which would warrant the jury in finding that the accident was due to such a fit. It would be the merest guesswork, and we have no right to take property from an individual or a corporation merely upon a guess.

Reaching this conclusion makes it unnecessary to go into the other questions presented upon this appeal. The charge of the court, as it related to the question of notice to the defendant of the condition of Roberts, was probably well up to the limit; but upon the question of evidence to show the proximate cause of the accident we are fully persuaded that the case was lacking, and that the order setting aside the verdict and dismissing the complaint was fully justified.

The order appealed from should be affirmed, with costs.

JENKS and RICH, JJ., concur.

GAYNOR, J. (dissenting). The verdict for the plaintiff has been set aside and the complaint dismissed on a motion of the defendant made at the close of the evidence. The jury were able to and did find the following facts from the evidence for the plaintiff, viz.: En-

gineer Roberts was bringing a freight train from Newburgh to Port Jervis. He used his air brakes and gave the usual signals at all crossings and stations all along to and including Guymard. From that station to Port Jervis, a distance of eight miles, and down grade, he let his engine go free of all control, gaining speed all the while, passed all signal places without giving any signal, i. e., of bell or whistle, entered the yard at Port Jervis without signal, passed a danger signal, and ran at the rate of from 50 to 60 miles an hour into an engine of which the plaintiff was engineer, causing the grievous injuries to him for which he sues. It was dark, near 9 o'clock p. m. in October. The shock of the collision set the airbrakes and stopped the train. He remained quietly in his cab for a while after the collision. Then he put on the injector to fill his boiler with fresh water, although it was much damaged and leaking. Also when asked who his fireman was he gave the name of another fireman, although he knew the name of his fireman. He then walked around to the front of his engine, and turned and left the yard. He was subject to epileptic fits, and had been for about 10 years. The plaintiff called witnesses who had seen him have such fits seven different times at intervals during that period, and up to within one year of the time of the accident. They occurred once on his engine and every time in or about the railroad yards of the depot, in the presence each time of several fellow employés, including engineers, firemen and a master mechanic, who had supervision and control of the engineers in the way of running and handling their engines.

The verdict was set aside and the complaint dismissed on the ground that there was no evidence that the said engineer had a fit on the occasion in question. But his terrible conduct had to be accounted for in some way. He testified he was not drunk or asleep, and that he had never had a fit at any time, but gave no explanation of his letting his engine go loose. But his testimony was not binding on the jury. After finding that he was subject to epileptic fits, liable to come upon him at any moment, the jury had the right to infer that he had one at this time. Suppose a ferry boat were let go by an epileptic pilot in such a way—would the cause be in fair doubt? His fireman testified for the defendant that he saw him sitting on his seat with his hand on the air brake from Guymard to Port Jervis, every time he looked toward him, but that he did not notice him have any fit or seizure. But the jury were not bound to believe his evidence; he was an employé of the defendant. He knew there was something wrong with the engineer. In his alarm he jumped up on the coal in the tender before the collision, and the brakemen, equally alarmed, tried to use the handbrakes, knowing something had gone wrong, and that the train was out of the control of the engineer. The expert evidence was that after such seizures the subject is hazy and stupid, and there was evidence that that was the engineer's condition after the collision, as we have seen. The fact that the engineer did not fall off his seat in the engine may easily be made too much of. His seat was on the right-hand side, his back was to the side of the engine and with his left hand he had hold of the brake handle, so that it was not at all

impossible that he might have kept his seat during the seizure, especially if it were not a hard one.

Nor was the evidence insufficient for a finding that the defendant had knowledge of the engineer's infirmity. It was so well known on the defendant's premises that it could be fairly found that the defendant knew of it, or would have known of it by ordinary attention. Warner v. N. Y. C. R. Co., 44 N. Y. 475; Gilman v. Eastern R. Co., 13 Allen (Mass.) 433, 444, 90 Am. Dec. 210; Id., 10 Allen (Mass.) 233, 87 Am. Dec. 635. We often allow juries to impute knowledge to municipal corporations of street defects on less evidence than we have in this case. Knowledge of that which is notorious, or widely known, may be imputed to those who have a duty in respect of it and to know it.

The order should be reversed and the judgment reinstated.

HOOKER, J., concurs.